Ishmael Sadiq Montague
Plaintiff, Pro Se
7321 Blaney Bluffs Lane, Raleigh, NC 27606
919-264-1422 * ismbeatsmgmt@gmail.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ISHMAEL SADIQ MONTAGUE,<br><br>Plaintiff,<br><br>v.<br><br>SONY MUSIC ENTERTAINMENT,<br><br>Defendant. | COMPLAINT<br><br>Jury Trial Demanded |

**I. PRELIMINARY STATEMENT**

1. Plaintiff Ishmael Sadiq Montague is a writer and producer. Since 2016 he has been entitled to a direct producer royalty from defendant Sony Music Entertainment on the master recording "Party" (performed by Chris Brown) under a producer agreement dated November 1, 2016 with Chris Brown Entertainment LLC ("CBE") and the payment-direction mereement incorporated in it. Sony has accounted and paid that royalty directly, to Vendor Account No. 1226609 (SE7EN INTL LLC, for the sole benefit of plaintiff), for nearly a decade.

2. In the summer of 2026, during a routine payee-change proceeding, Sony's representatives made written statements about Sony's own records that were false; described to plaintiff and his representatives requirements as "rigid" and "unchangeable" company policy while a different, acceptable instrument sat in Sony's own files, created twelve days before it was produced; and transmitted that alternate instrument the same morning plaintiff refused it in writing. Sony applied commercial pressure in parallel to the payment stream itself. On August 29, 2026 plaintiff executed the instrument Sony produced. Sony now describes the matter as "fully resolved." It is not.

3. Separately, Sony has applied a producer rate on the Party master at half the agreed rate: 0.75% rather than the 1.5% to which plaintiff is entitled after the split with co-producer A1 (3% gross). A July 2026 third-party review identified the discrepancy, and plaintiff's written report to Sony on August 25, 2026 documented an underpayment of approximately fifty percent on the most recent period.

4. Sony's position, expressed through counsel on October 15, 2026, is that it ultimately did what it was supposed to do, and that the matter is "fully resolved." Plaintiff's position is that Sony was supposed to do it from the start, and that the six weeks of conduct were never merely about a royalty payment. The payee change Sony stalled was a necessary step of a separate commercial transaction: the June 25, 2026 purchase agreement under which plaintiff sold his royalty interests to a third party. Sony was a stranger to that transaction, and for six weeks it stood in the way of it - stalling the change through misrepresentations about its own records and policy, concealing an acceptable alternate instrument in its own files, and tying the transaction's consideration to plaintiff's acceptance of Sony's demanded payment direction. This action seeks compensation for that interference and that attempted fraudulent inducement, in an amount of no less than $1,247,500, together with punitive damages and an accounting and court-supervised audit of the rate basis applied on Vendor Account No. 1226609, as demanded in the prayer below. The compensation sought is not a computation of royalties; it is what the conduct cost, and what it would have cost Sony to obtain those concessions honestly.

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction under 28 U.S.C. 1332(a). Plaintiff is a citizen of North Carolina, residing at 7321 Blaney Bluffs Lane, Raleigh, North Carolina 27606. Defendant Sony Music Entertainment is a New York general partnership with its principal place of business at 25 Madison Avenue, New York, New York 10010, and is a citizen of New York for purposes of diversity jurisdiction. A search of the New York Department of State Division of Corporations database reflects no registration of the defendant as a corporation or limited liability company; the defendant operates the royalty accounting at issue from that office. Upon information and belief, the defendant's ownership and control run through Sony Corporation of America, a New York domestic business corporation with its principal executive office at 25 Madison Avenue, New York, New York (N.Y. DOS ID No. 126313), whose citizenship is that of New York.

6. The amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue lies in this district under 28 U.S.C. 1391(b)(1) and (b)(2): defendant resides in and does business in this district, at 25 Madison Avenue, New York, New York, and a substantial part of the events giving rise to the claims occurred through correspondence directed to and conduct occurring at that office.

## III. PARTIES

8. Plaintiff Ishmael Sadiq Montague is an individual, a writer and producer. He is the owner of SE7EN INTL LLC, the earnings participant of record on Vendor Account No. 1226609, which Sony maintains "f/s/o Ishmael Montague." Plaintiff's address is 7321 Blaney Bluffs Lane, Raleigh, North Carolina 27606.

9. Defendant Sony Music Entertainment ("Sony") is a New York general partnership doing business at 25 Madison Avenue, New York, New York 10010, where its royalties department (19th floor) issues the statements at issue in this action.

10. At all relevant times, Sony's employees and agents, including its account royalty manager (initials "S.S."; full identity to be disclosed in discovery) and in-house counsel acting for Sony, acted within the scope of their employment and agency. All references herein to Sony include its employees and agents acting on its behalf.

## IV. FACTS

A. The rights and the direct-payment relationship

11. On November 1, 2016, plaintiff and co-producer A1 entered a producer agreement (the "CBE Agreement") with CBE for the master recording "Party" (Chris Brown), Contract No. Z7445. The CBE Agreement provides a producer royalty of 3%, of which 1.5% accrues to plaintiff after the split with A1, and incorporates by its Exhibit A a payment-direction mechanism under which the record company (Sony) pays producer royalties directly to the designated payee.

12. Sony has issued earnings statements and paid royalties on Vendor Account No. 1226609 (SE7EN INTL LLC f/s/o Ishmael Montague) directly to plaintiff throughout the life of the account, including for periods ending June 30, 2020, June 30, 2023, and December 31, 2025. Sony's statements and records for the account are in plaintiff's possession and will be produced to the Court as required.

13. On June 25, 2026, plaintiff and SE7EN INTL LLC entered into a purchase agreement (the "APA") with Xposure Music Holdings Inc. covering, among other assets, plaintiff's royalty interests in specified masters, including the royalty paid on Vendor Account No. 1226609. Under the APA, the September 1, 2026 and later payments on the account were to be directed to the purchaser, and plaintiff instructed accordingly.

B. The 2026 payee-change proceedings and Sony's conduct

14. Beginning on or about July 9, 2026, and continuing through September 4, 2026, Sony, through its account royalty manager, processed the payee change and insisted that a 2026 Letter of Direction ("LOD") on Sony's form was required, in addition to the assignment instruments, and that its requirements were rigid company policy that could not be varied.

15. Sony's own standard payee-change mechanism was available throughout. Plaintiff's manager placed that mechanism before Sony in writing on July 24, 2026: the same account had been changed before, without objection, through Sony's own change-request process. Sony did not dispute the prior use, and never answered why the process it later described as rigid policy was not simply applied here.

16. On July 24, 2026, Sony's representative stated in writing that Sony could not act because it had "not received direction from the artists" regarding plaintiff's royalties on the Party master.

17. That same afternoon, July 24, 2026, the same representative wrote that Sony was "not accounting to the producer already," and that "if Sony had previously accepted it, there would already be an account."

18. Both statements were false, and Sony knew them to be false: Sony's own earnings statements for Vendor Account No. 1226609 - including the periods ending June 30, 2020, June 30, 2023, and December 31, 2025 - show continuous, direct accounting to plaintiff's account on the very master at issue. The statements were placed before Sony the same evening, and Sony's July 28, 2026 response confirmed that "we are accounting on the Chris Brown track," without acknowledging that either earlier statement was untrue.

19. From August 17 through August 24, 2026, Sony's representatives maintained in writing that the LOD requirements were uniform and unchangeable policy.

20. The file properties of the instrument Sony ultimately transmitted - a "Producer Royalty Assignment Form" - show it was created on August 13, 2026 at 12:23 PM ET by a Sony Music employee, and last modified on August 24, 2026 at 6:57 PM ET, the same evening plaintiff escalated the matter to Sony's Office of the General Counsel. That is, while Sony's representatives described the requirements as rigid policy on August 17 and August 24, a different, acceptable instrument already existed in Sony's files, created August 13.

21. On August 24, 2026, in parallel, a commercial offer was made that tied a percentage of the consideration owed to plaintiff to plaintiff's acceptance of the payment direction, on the threat of extended withholding if the payment was not directed as demanded. That same evening, the purchasing company confirmed the arrangement.

22. On August 25, 2026 at 9:07 AM PT, plaintiff refused the LOD in writing. At 10:28 AM PT the same morning, Sony's representative transmitted the alternate "Producer Royalty Assignment Form," offered "in lieu of the LOD," noting it "has not yet been officially rolled out to all royalty participants," with the objectionable language removed. The form and its electronic properties are preserved.

23. Throughout the proceedings, Sony required that the payment-direction instruments include an acknowledgment that the payee has no right to audit Sony or any of its affiliates or subsidiaries - including RCA Records and Chris Brown Entertainment LLC, the very entities whose accounting of the account was in question. That requirement persisted through August 2026 - the same month in which plaintiff reported, in writing, the fifty-percent underpayment on the account. The representations about rigid policy, the stall, and the audit acknowledgment served the same posture: delay the change until the acknowledgment was given. Whether Sony's representatives knew that the profit-share terms of the June 25, 2026 purchase agreement depended in part on the accounting of the account Sony was directing is a matter for discovery.

24. On August 29, 2026, plaintiff executed the form Sony produced. The executed instrument contains no release, no waiver, and no acknowledgment of any account.

25. On October 13, 2026, plaintiff served Sony's Office of the General Counsel with a Notice of Claim by email and by certified mail, describing this conduct and demanding payment.

26. On October 15, 2026, Sony, through in-house counsel, denied liability, asserting lack of privity and describing the matter as "fully resolved." Sony's letter does not address the conduct record.

C. The underpayment

27. The producer royalty agreed for the Party master is 3%, of which 1.5% accrues to plaintiff after the A1 split. Sony has applied 0.75% - half the agreed rate - at the vendor level. The basis is a July 2026 review of plaintiff's statements and agreements, reported to Sony in writing on August 25, 2026.

28. Plaintiff reported the underpayment to Sony in writing on August 25, 2026, on the most recent statement period, documenting an approximately fifty percent underpayment. The written report and the statement period concerned are preserved.

**V. FIRST COUNT - Fraudulent Misrepresentation**

29. Plaintiff repeats the allegations of paragraphs 1 through 28.

30. On July 24, 2026, and on August 17 and 24, 2026, Sony, through its representatives, made written statements of material fact: that Sony had "not received direction from the artists"; that Sony was "not accounting to the producer already" and no account existed; and that the LOD requirements were rigid, unchangeable company policy.

31. The statements were false when made. Sony's own records - its earnings statements and its Vendor Account No. 1226609 - show direct accounting to plaintiff on the Party master since at least 2020, and its files contained an acceptable alternate instrument created August 13, 2026.

32. Sony knew the statements were false or made them with reckless disregard for their truth.

33. Plaintiff and his representatives relied on Sony's representations in the course of the proceedings, refraining from earlier escalation and spending weeks negotiating against a policy that did not exist. Plaintiff's refusal on August 25, 2026 and the immediate production of the alternate instrument demonstrate what was true all along.

34. Plaintiff was damaged by the conduct: the payee change was consummated on a false premise; six weeks of negotiation against a policy that did not exist consumed plaintiff's time and resources, delayed his payment, and stood in the way of the June 25, 2026 transaction the change was a step of; the September 1, 2026 payment was made under the direction Sony procured through that conduct; and concessions Sony could not have obtained honestly were extracted through it.

## VI. SECOND COUNT - Fraud by Concealment

35. Plaintiff repeats the allegations of paragraphs 1 through 34.

36. Sony had a duty to disclose the existence of the acceptable alternate instrument during the proceedings in which it insisted its requirements were rigid policy. The instrument's existence was uniquely within Sony's knowledge; its file metadata was not visible to plaintiff or his representatives until produced in discovery of the underlying documents; and Sony's conduct obstructed the payee change plaintiff was entitled to have processed.

37. Sony concealed the alternate instrument from at least August 17 through August 24, 2026 while maintaining that no alternative existed, and revealed it only after plaintiff refused and escalated. Plaintiff was damaged as described above.

38. The concealment served a purpose. The longer the nonexistent requirements held, the more likely the acknowledgment Sony demanded - that the payee has no right to audit Sony or any of its affiliates or subsidiaries - would be executed. The underpayment plaintiff reported in writing on August 25, 2026, on the account Sony was directing, makes the value of that acknowledgment to Sony apparent.

## VII. THIRD COUNT - Negligent Misrepresentation

39. Plaintiff repeats the allegations of paragraphs 1 through 38.

40. Sony, in a commercial relationship in which it supplied information to plaintiff and his representatives for the conduct of the payee change, negligently made the false statements described, without reasonable care in ascertaining their accuracy against Sony's own records. Plaintiff justifiably relied and was damaged.

## VIII. FOURTH COUNT - Economic Duress and Attempted Fraudulent Inducement

41. Plaintiff repeats the allegations of paragraphs 1 through 40.

42. In August 2026, Sony wrongfully exerted economic pressure on plaintiff: it maintained false requirements that stalled the payment of plaintiff's own royalties, while a commercial offer tied consideration owed to plaintiff to plaintiff's acceptance of the demanded payment direction, on the threat of extended withholding.

43. The pressure was wrongful. Requirements that survive six weeks of informed, written objection from plaintiff's manager and the counsel he was paying were never requirements - they were positions of convenience, held while holding them was costless and abandoned once they had served their purpose. The objection of plaintiff's authorized representatives was plaintiff's own objection, and Sony had no basis to treat it as less.

44. Plaintiff does not seek avoidance of the instrument he executed on August 29, 2026 or of the payment instruction that followed it; those reflect the direction plaintiff was prepared to give all along. What plaintiff was not prepared to accept was the original LOD - the instrument with the audit acknowledgment and the other terms Sony's representatives described as unchangeable policy. The pressure is pleaded as the means by which Sony attempted to procure that instrument, and it bears on the compensatory and punitive damages sought.

## IX. FIFTH COUNT - Accounting / Mispayment at the Vendor Level

45. Plaintiff repeats the allegations of paragraphs 1 through 44.

46. Under the CBE Agreement and its payment-direction mechanism, Sony pays plaintiff's producer royalties directly on Vendor Account No. 1226609. Sony has applied 0.75% where the agreed rate yields 1.5% to plaintiff, and has never rendered a full and correct accounting of the rate basis applied on the account. The CBE Agreement routes examination of the record company's books through the court rather than through direct audit; the audit of Sony's accounting of the account is therefore demanded here.

47. Plaintiff is entitled to an accounting and an audit of the rate basis applied and the sums payable on Vendor Account No. 1226609 for all periods, and payment of the balance found due, with the costs of the accounting and audit borne by Sony.

## X. SIXTH COUNT - Tortious Interference

48. Plaintiff repeats the allegations of paragraphs 1 through 47.

49. Sony is a stranger to the June 25, 2026 purchase agreement under which plaintiff sold his royalty interests. The payee change at issue was a necessary step of that transaction, and Sony intentionally interfered with it: through the false statements and invented policy described above, it stalled the change for six weeks; through the August 24, 2026 offer, it tied consideration owed to plaintiff under the transaction to plaintiff's acceptance of Sony's demanded payment direction; and through attempted fraudulent inducement it sought to dictate the instruments by which the transaction's payments would move. The interference was accomplished by dishonest and improper means, and it caused the delays, losses, and expenses described.

## XI. SEVENTH COUNT - N.Y. Gen. Bus. Law 349 (Deceptive Acts or Practices)

50. Plaintiff repeats the allegations of paragraphs 1 through 49.

51. Sony's conduct was deceptive in the conduct of its business: it made false statements about its own records, maintained invented requirements as rigid and unchangeable company policy, concealed an acceptable alternate instrument in its own files, and demanded an acknowledgment that would have waived the payee's audit rights across Sony and its affiliates and subsidiaries. The conduct was consumer-oriented - it was the standard procedure by which Sony processes payee changes for royalty participants in its regular course of business - it was materially misleading, and it caused plaintiff substantial injury.

52. By reason of the foregoing, Sony violated New York General Business Law Section 349, and plaintiff is entitled to the damages, costs, and other relief the statute provides.

## XII. PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully demands judgment against defendant Sony Music Entertainment as follows:

A. On compensatory damages for the conduct described in Counts I through IV, VI, and VII, in an amount to be proven at trial, and in no event less than $1,247,500;

B. Punitive damages on the fraud counts;

C. An accounting and a court-supervised audit of Vendor Account No. 1226609 and of all masters on which plaintiff holds or may hold royalty interests, with the costs of the audit borne by defendant, and payment of the balance found due;

D. Pre-judgment and post-judgment interest;

E. Costs of this action; and

F. Such other and further relief as the Court deems just and proper.

A jury trial is demanded on all counts so triable.

Dated: October 17, 2026
Raleigh, North Carolina

Respectfully submitted,

/s/ Ishmael Sadiq Montague
Ishmael Sadiq Montague
Plaintiff, pro se
7321 Blaney Bluffs Lane
Raleigh, North Carolina 27606
919-264-1422
ismbeatsmgmt@gmail.com