Ishmael Sadiq Montague
Plaintiff, Pro Se
7321 Blaney Bluffs Lane
Raleigh, North Carolina 27606
919-264-1422 | ismbeatsmgmt@gmail.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ISHMAEL SADIQ MONTAGUE,

Plaintiff,

- against -

SONY MUSIC ENTERTAINMENT,

Defendant.

Case No. 1:26-cv-09091

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Ishmael Sadiq Montague, pro se, alleges against defendant Sony Music Entertainment as follows. This First Amended Complaint is filed as of right under Federal Rule of Civil Procedure 15(a)(1) and supersedes the complaint submitted on October 16, 2026.

## I. PRELIMINARY STATEMENT

1. Plaintiff Ishmael Sadiq Montague is a writer and record producer. Since 2016, defendant Sony Music Entertainment ("Sony") has accounted and paid his producer royalties on the master recording "Party" (Chris Brown) directly to Vendor Account No. 1226609, maintained in the name of SE7EN INT'L LLC for plaintiff's sole benefit. Sony has done so for nearly a decade, on the direction of the artist's company, Chris Brown Entertainment LLC ("CBE").

2. In June 2026, plaintiff sold his right to receive future royalties on seven masters distributed by Sony, including Party, to a third-party purchaser. The sale required one ministerial step from Sony: written acknowledgment of a payment redirect, by email. Sony's representative

turned that step into a six-week campaign. She told plaintiff's representatives that Sony had "not received direction from the artists" on Party; that Sony was "not accounting to the producer already"; and that a set of conditions Sony had written into plaintiff's Letter of Direction were company policy, "consistent with every assignment that Sony processes," and "required for every royalty participant who assigns/sells their royalties." Each statement was false, and Sony's own records showed it.

3. The conditions were not paperwork. Had plaintiff signed what Sony told him policy required, he would have surrendered, across all seven masters, any approval rights he held under his producer agreements; his right to assign his own agreements without Sony's prior written consent; any claim against Sony for erroneous payment; and his freedom to disclose any fact about the negotiation itself. He refused. Sony's response to his refusal is the center of this case.

4. On August 24, 2026, at 6:15 p.m. Eastern, plaintiff refused the conditions in writing. At 6:42 p.m. he escalated the matter to Sony's General Counsel. At 6:56 p.m. he sent the same Sony personnel a desk-review finding of a fifty-percent reduction on a line of his most recent Sony statement. At 6:57 p.m., one minute later, a "Producer Royalty Assignment Form" in Sony's own files was last modified. That form had been created by a Sony employee on August 13, 2026, the same day Sony's representative told plaintiff's counsel that the conditions were "based on our company policies." The next morning Sony sent the form "in lieu of the LOD," without any of the conditions it had called policy for six weeks. Sony's in-house counsel has since admitted in writing that the form "did not include any of the form language with which ISM initially took issue."

5. Sony now says that it owes plaintiff nothing, has no privity with him, and considers the matter "fully resolved." It is not. This action seeks compensatory and punitive damages for Sony's fraud, concealment, interference, and deceptive practices, and a declaration of plaintiff's rights that Sony's own position puts in dispute.

## II. JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction under 28 U.S.C. 1332(a)(1). The parties are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Plaintiff is a citizen of the State of North Carolina, domiciled at 7321 Blaney Bluffs Lane, Raleigh, North Carolina 27606.

8. Defendant Sony Music Entertainment is a Delaware general partnership. For purposes of diversity jurisdiction a partnership takes the citizenship of each of its partners. Upon information and belief, and as Sony has itself pleaded in federal court, Sony's partners are citizens of New York and Delaware. No partner of Sony is a citizen of North Carolina. Sony's principal place of business is 25 Madison Avenue, New York, New York 10010.

9. This Court has authority to grant declaratory relief under 28 U.S.C. 2201 and 2202.

10. Venue lies in this District under 28 U.S.C. 1391(b)(1) and (b)(2). Sony resides in this District, and a substantial part of the events giving rise to the claims occurred here: Sony's royalties department and business and legal affairs personnel conducted the conduct alleged from 25 Madison Avenue, New York, New York.

## III. PARTIES

11. Plaintiff Ishmael Sadiq Montague, professionally known as ISM, is a writer and producer. He owns and controls SE7EN INT'L LLC, a North Carolina limited liability company, which is the payee of record on Sony Vendor Account No. 1226609, maintained for plaintiff's sole benefit.

12. By a written Assignment of Claims dated October 25, 2026, SE7EN INT'L LLC assigned to plaintiff all of its claims against Sony arising out of or relating to Vendor Account No. 1226609, the royalties accounted on it, and the 2026 payment-redirect proceedings described below. Plaintiff sues in his own right and as assignee.

13. Defendant Sony Music Entertainment is a Delaware general partnership with its principal place of business at 25 Madison Avenue, New York, New York 10010. RCA Records is a division of Sony. Sony's royalties department (19th Floor, 25 Madison Avenue) renders the statements on Vendor Account No. 1226609.

14. At all relevant times, Sony acted through its employees and agents within the scope of their employment, including Sarah Sieminski of Sony's Business & Legal Affairs department (Commercial Music Group), who handled the payee-change request; a second Sony employee identified in her correspondence as "Melina"; the Sony employee recorded as the author of the Producer Royalty Assignment Form; and Sony's in-house counsel.

## IV. FACTS

### A. The direct-payment relationship

15. On November 1, 2016, plaintiff and co-producer Floyd Bentley p/k/a A1 entered a producer agreement with CBE for the master "Party" (the "Party Agreement"). The Party Agreement provides a producer royalty of 3% (1.5% to plaintiff after the split with A1) and

attaches, as Exhibit A, a letter of direction from CBE addressed to "RCA Records, a division of Sony Music Entertainment," directing Sony to account and pay the producer directly (the "Artist LOD").

16. Sony accepted the Artist LOD and has accounted and paid plaintiff's Party royalties directly on Vendor Account No. 1226609 throughout the life of the account, including for the periods ending June 30, 2020, June 30, 2023, and December 31, 2025. Sony's statements for those periods are in plaintiff's possession.

17. In January 2023, the same vendor account was redirected using Sony's standard notarized "Change Request: Payee Form," in connection with plaintiff's transaction with Royalty Exchange. No letter of direction was required, no audit language was requested, and no rights were demanded.

**B. The sale and the ministerial step it required**

18. On June 25, 2026, plaintiff and SE7EN INT'L LLC entered a Purchase Agreement (the "APA") with Xposure Music Holdings Inc. ("Xposure"), selling the right to receive royalties earned on or after July 1, 2026 on scheduled masters, including seven masters distributed by Sony: Party; Part Of The Plan; Hotel Bathroom; Cana; Mochi; Stop Playin; and Aye Mami (the "Sony Masters"). Royalties earned before July 1, 2026 remained plaintiff's.

19. As a condition to payment of the purchase price, the APA required plaintiff to deliver letters of direction to Sony and to "obtain written acknowledgment and acceptance thereof by such parties (email sufficient)." The APA further provided that Xposure would hold back ten percent of the purchase price until fourteen days after Xposure's receipt of its first royalty statement and first payment from Sony.

20. Sony is not a party to the APA. It knew of the sale and its purchaser from the first day of the proceedings described below, and plaintiff's representatives told Sony in writing that the matter was "time sensitive."

**C. Sony's false statements**

21. On July 14, 2026, Ms. Sieminski required a Word version of plaintiff's letter of direction "pursuant to our company policy regarding assignments of royalties."

22. On July 24, 2026, at 1:24 p.m. Eastern, Ms. Sieminski returned the letter with Party removed, writing: "we have not received direction from the artists to account to your client on these tracks. You'll need to contact the artists instead." Approximately one hour later, plaintiff's manager sent her the fully executed Party Agreement, including the Artist LOD signed by CBE and addressed to Sony.

23. At 4:16 p.m. the same day, Ms. Sieminski wrote: "Since we are not accounting to the producer already, that means the authorization is not in place. If Sony had previously accepted it, there would already be an account." She added that "company policy requires the artist to submit an LOD to their label contact."

24. Both July 24 statements were false, and Sony's records showed it. Sony had been accounting to plaintiff on Party for years on Vendor Account No. 1226609, on the Artist LOD it had accepted. On July 28, 2026, Ms. Sieminski wrote: "I have confirmed that we are accounting on the Chris Brown track," without correcting either statement. On August 24, 2026, she wrote that plaintiff's rights were governed by "your contract and the subsequent LOD submitted by the artist to Sony," confirming that the artist's direction she had denied receiving was in Sony's possession.

25. Had plaintiff accepted the July 24 statements, Party, the largest of the Sony Masters, would have been removed from his direction to Sony, and plaintiff would have been sent to re-paper with the artist a payment relationship Sony had been performing for a decade.

26. Sony then wrote into plaintiff's letter of direction a set of conditions (the "Conditions") and told plaintiff's representatives, repeatedly and in writing, that the Conditions were mandatory company policy applied to every assignment. On July 28, 2026: "Pursuant to company policy, we cannot accept the majority of the requested changes"; the changes "are against our policies regarding assignments of royalties. This is consistent with all assignments we process"; and the comments "are consistent with every assignment that Sony processes." On July 29, 2026: "We cannot agree to any changes regarding the audit language." On August 13, 2026, to plaintiff's counsel: "The comments you're seeing are based on our company policies." On August 17, 2026: "we cannot accept the LOD. The change of payee form will be accepted and processed once we have the approved LOD." On August 24, 2026: "every comment I have made on the LOD is consistent with Sony company policy," and "This is required for every royalty participant who assigns/sells their royalties. I cannot approve an LOD that doesn't meet our requirements."

27. The Conditions, in Sony's clean copy of July 28, 2026, provided among other things that: (a) "any approval rights I may have under the Agreements ... shall no longer apply as of the date hereof, and neither I nor the Assignee shall have any consent rights under the Agreements"; (b) "I shall not have the right to assign the Agreements or any of our rights thereunder without Label's prior written consent, and any purported assignment ... shall be null and void"; (c) "the Label shall have no liability by reason of any erroneous payment it may make"; (d) the purchaser would have no audit rights "either directly or indirectly (e.g.,

authorizing Assignee to audit on my behalf)"; (e) plaintiff would sign an inducement letter on Sony's demand; and (f) plaintiff and his attorneys, accountants, and managers would hold in confidence "any fact, matter, event or surrounding circumstance leading to or relating to the negotiation" of the letter. The Conditions applied to all seven Sony Masters.

28. On July 28, 2026, Ms. Sieminski also wrote that "Sony pays the producer as an accommodation to the artist(s) and while we have no legal obligation to the producer," the letter of direction and change-of-payee paperwork were "subject to my approval, not simply an acknowledgment." Sony thus claimed approval power over plaintiff's sale while disclaiming any obligation to him.

29. The statements that the Conditions were uniform, mandatory policy were false. Sony's own files held an alternative instrument, without the Conditions, from at least August 13, 2026. When Sony produced it, Ms. Sieminski wrote that it "has not yet been officially rolled out to all royalty participants"; Sony's counsel later called it "a special accommodation" and "a compromise." A requirement that yields in one morning, upon refusal, was never a requirement.

**D. The instrument in Sony's files**

30. On August 12, 2026, plaintiff submitted Sony's own notarized change-of-payee form for the account.

31. On August 13, 2026, the electronic properties of the Producer Royalty Assignment Form that Sony later sent (the "Form") record its creation at 12:23 p.m. Eastern, authored by a Sony Music employee. At 4:05 p.m. that day, Ms. Sieminski wrote to plaintiff's counsel that the Conditions were "based on our company policies," and that "we are no longer able to implement changes in time for the September rendering period. At the direction of your

client, I can put his vendor on hold so it doesn't pay out next month and we can readdress in October." She did not disclose the Form.

32. From August 13 through August 24, 2026, Sony continued to state that the Conditions were mandatory policy and to withhold processing of plaintiff's notarized change-of-payee form until he accepted them.

33. On August 24, 2026, plaintiff, in reliance on Sony's representation that the Conditions were mandatory, wrote to Ms. Sieminski: "I have agreed to every term you included in the LOD. All of them," asking only that Sony either remove the waiver language or pay consideration for it. In a counter-draft he placed a value on the rights Sony was demanding: $1,247,500.

34. The same evening, the record shows the following sequence, all times Eastern: at 6:15 p.m., plaintiff refused in writing to sign provisions that bound him to waive rights ("My LOD is a payment instruction ... that is all I am willing to sign"); at 6:42 p.m., he escalated the matter to senior Sony personnel, including Sony's General Counsel, Stephanie Yu; at 6:56 p.m., he sent the same Sony personnel the written finding of a desk audit of his most recent Sony statement, identifying a fifty-percent reduction on a royalty line; and at 6:57 p.m., the Form was last modified in Sony's files.

35. On August 25, 2026, at 1:27 p.m. Eastern, Ms. Sieminski sent the Form "[a]s an accommodation and to be completed in lieu of the LOD," noting that it "has not yet been officially rolled out to all royalty participants." The Form contains none of the Conditions. Sony did not respond to plaintiff's valuation; it dropped the demand.

36. Plaintiff executed the Form, as corrected, on August 30, 2026, and his counsel returned it to Sony on August 31, 2026. The Form assigns only the right to receive royalties. It

contains no waiver of approval, consent, audit, or examination rights, no restraint on assignment requiring Sony's consent, no release of erroneous-payment claims, and no confidentiality obligation. On September 1, 2026, Sony confirmed "there is no block on the vendor."

**E. What the conduct cost plaintiff**

37. Sony's six weeks of false requirements delayed satisfaction of the APA's acknowledgment condition from July 2026 until September 1, 2026, and with it payment of the purchase price, which plaintiff received on September 4, 2026.

38. Plaintiff and his representatives spent six weeks negotiating against requirements that did not exist, and plaintiff incurred professional fees and costs to do so, including counsel fees for review and drafting of letters of direction, change-of-payee paperwork, and responses to Sony's stated policy.

**F. The underpayment Sony's audit language would have shielded**

39. In August 2026, a desk review of plaintiff's most recent Sony statement, conducted by the royalties team of a chartered accountancy firm in London, identified a line (row 4160 of the statement for the period ending December 31, 2025) on which Sony applied a 7.5% net-profit rate where 15% was applied to the same income type elsewhere: a fifty-percent reduction with no basis in the contractual terms provided, $652.51 paid against $1,305.02. An earlier review of plaintiff's Sony statements, in July 2026, indicated a reduction at the vendor-account level on Party. The reviewer noted that the royalty schedule referenced in the Party Agreement as Attachment 1 had never been provided, and that the extent of any underpayment cannot be determined without Sony's source records.

40. Plaintiff sent the desk-review finding to Sony in writing on August 24, 2026, at 6:56 p.m. Eastern. Sony's response was not to correct the statement or explain the rate. Within

one minute, Sony's alternative Form was finalized, and the next morning Sony abandoned the Conditions.

41. Throughout the period in which Sony demanded the Conditions, including the bar on any audit by or on behalf of the purchaser and the release of Sony's liability "by reason of any erroneous payment," Sony's own most recent statement on the account carried an unexplained fifty-percent reduction.

**G. Sony's present position**

42. On October 13, 2026, plaintiff served Sony's Office of the General Counsel with a Notice of Claim by email, and dispatched it by certified mail on October 16, 2026.

43. On October 15, 2026, Sony's in-house counsel responded that Sony "owes no contractual obligation to (and has no contractual privity with)" plaintiff or SE7EN INT'L LLC; that neither "has any related audit or consent right (or other similar right of any kind) as to Sony Music that is capable of waiver or compromise in the first instance"; that the Form "did not include any of the form language with which ISM initially took issue"; that Sony provided it as "a special accommodation" and "a compromise"; and that Sony "considers this matter fully resolved."

44. Sony's positions cannot be reconciled. Sony demanded, as mandatory policy, that plaintiff surrender rights it now says never existed; claimed approval over his sale while disclaiming any obligation to him; and on August 24, 2026 asserted that any future assignment by plaintiff "will also be subject to Sony's approval," while now asserting it has no relationship with him at all. Plaintiff holds royalty interests on Sony-distributed masters and intends to deal in them. An actual controversy exists over whether Sony may condition or approve his future assignments, and over the scope and effect of the Form.

## V. FIRST COUNT: FRAUDULENT MISREPRESENTATION

45. Plaintiff repeats the allegations above.

46. Sony, through Ms. Sieminski, made written misrepresentations of material fact to plaintiff and his representatives: on July 24, 2026, that Sony had "not received direction from the artists" on Party and was "not accounting to the producer already"; and on July 28, July 29, August 13, August 17, and August 24, 2026, that the Conditions were mandatory company policy, "consistent with every assignment that Sony processes" and "required for every royalty participant."

47. The statements were false when made. Sony's records showed years of direct accounting to plaintiff on Party under the Artist LOD in Sony's possession, and Sony's files held an instrument without the Conditions from at least August 13, 2026, which Sony issued upon refusal and has since called a special accommodation.

48. Sony knew the statements were false, or made them recklessly, without consulting the records and files in its own possession. Sony made them to induce plaintiff to surrender the rights described in the Conditions.

49. Plaintiff justifiably relied. Sony had exclusive access to its own records, files, and policies, and its representative held herself out as the authority on them. In reliance, plaintiff and his representatives negotiated for six weeks against the stated policy rather than demanding the standard process Sony had used on the same account in 2023; incurred professional fees and costs; prepared and submitted successive drafts and a notarized change-of-payee form inside the process Sony dictated; and on August 24, 2026 agreed in writing to "every term you included in the LOD," asking only for consideration.

50. Plaintiff was damaged in an amount to be determined at trial, including professional fees and costs incurred, the time and resources consumed, and the delay of the purchase price.

51. Sony's conduct was willful, wanton, and morally culpable. It was directed at a royalty participant whose sale depended on Sony's cooperation, it sought the surrender of valuable rights by false statements about Sony's own records and policy, and it was abandoned only when plaintiff refused, escalated, and sent Sony the desk-review finding of an underpayment on its own statement. Punitive damages are warranted.

## VI. SECOND COUNT: FRAUDULENT CONCEALMENT

52. Plaintiff repeats the allegations above.

53. Sony had a duty to disclose the existence of the Form. It had made partial and misleading statements that the Conditions were mandatory and that no alternative existed, and the existence of the Form was peculiarly within Sony's knowledge, in files plaintiff could not access.

54. Sony concealed the Form from at least August 13 through August 25, 2026, while continuing to represent that the Conditions were required and while withholding processing of plaintiff's notarized change-of-payee form, and disclosed it only after plaintiff refused, escalated to Sony's General Counsel, and sent Sony the desk-review finding of an underpayment on its own statement.

55. Plaintiff relied on Sony's silence and incomplete statements, as alleged in the First Count, and was damaged as alleged. Sony's concealment was willful and warrants punitive damages.

## VII. THIRD COUNT: NEGLIGENT MISREPRESENTATION (IN THE ALTERNATIVE)

56. Plaintiff repeats the allegations above.

57. Sony and plaintiff stood in a special relationship. For nearly a decade Sony had accounted directly to plaintiff on Vendor Account No. 1226609, and Sony alone possessed the records of that account and the policies it invoked. Sony required that plaintiff's sale pass through Sony's approval, and its representative supplied information about Sony's records and policy for the purpose of guiding plaintiff's conduct of the redirect.

58. Sony supplied the false information alleged above without reasonable care in ascertaining its accuracy against its own records and files. Plaintiff justifiably relied, as alleged, and was damaged.

## VIII. FOURTH COUNT: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

59. Plaintiff repeats the allegations above.

60. Plaintiff had a business relationship with Xposure under the APA and its continuing terms, including the purchase price, the holdback, and the parties' ongoing dealings over the Sony Masters. Sony knew of that relationship.

61. Sony intentionally interfered with it by dishonest, unfair, and improper means: its misrepresentations about its own records, its invented policy, and its concealment of the Form, deployed to extract the Conditions as the price of an acknowledgment the APA required by email.

62. Sony's interference delayed the closing payment and burdened the relationship, causing plaintiff damages in an amount to be determined at trial. Because the means were fraudulent, punitive damages are warranted.

## IX. FIFTH COUNT: DECLARATORY JUDGMENT (28 U.S.C. 2201, 2202)

63. Plaintiff repeats the allegations above.

64. An actual, substantial, and immediate controversy exists between plaintiff and Sony. Sony asserts that plaintiff's future assignments of royalties on Sony-distributed masters are subject to Sony's approval, and that the Form subjects any future assignment to "the same terms and conditions," while asserting that it owes plaintiff no obligation and has no privity with him. Plaintiff holds royalty interests on Sony-distributed masters, intends to deal in them, and cannot do so while Sony claims an approval right over the transaction.

65. Plaintiff is entitled to a declaration that: (a) the Form, as executed, assigned to Xposure only the right to receive royalties earned on or after July 1, 2026 on the Sony Masters, and effected no waiver, release, or surrender by plaintiff of any right or claim, including any approval, consent, audit, examination, or assignment right under his producer agreements and any claim concerning the accuracy of royalties accounted on Vendor Account No. 1226609 for periods through June 30, 2026; (b) plaintiff is not bound by any of the Conditions, which he never executed; and (c) Sony, having disclaimed any contractual relationship with plaintiff, holds no right to approve, condition, or consent to plaintiff's assignment or sale of his royalty interests in recordings distributed by Sony.

66. Under 28 U.S.C. 2202, plaintiff is further entitled to such further relief as is necessary or proper based on the declaration, including an accounting by Sony of all sums credited to Vendor Account No. 1226609 for each master credited to it, for all periods through June 30, 2026.

## X. SIXTH COUNT: DECEPTIVE ACTS AND PRACTICES (N.Y. GEN. BUS. LAW 349)

67. Plaintiff repeats the allegations above.

68. Sony's conduct was consumer-oriented. Sony did not describe the Conditions as terms negotiated for this transaction. It described them as a standard practice applied to the public of royalty participants: "consistent with all assignments we process," "consistent with every assignment that Sony processes," and "required for every royalty participant who assigns/sells their royalties." Sony explained that it adopted the practice because "assignments of royalties have become increasingly popular, with more purchasing companies being founded every year," and stated that its replacement Form "will become part of our standard required process for a producer assignment of royalties going forward." The practice reaches every individual producer, artist, and royalty participant paid by Sony who seeks to sell or redirect royalties.

69. The practice was deceptive and misleading in a material way. Sony represented to royalty participants that the surrender of approval, consent, assignment, and erroneous-payment rights, and a gag on the facts of the negotiation, were mandatory conditions of redirecting their own royalties, when Sony held and could issue an instrument without them, and did so upon refusal. A reasonable royalty participant acting reasonably would be misled into believing that the rights must be surrendered to complete a sale.

70. Plaintiff was injured by the practice, as alleged above, and is entitled to his actual damages and the additional relief provided by Section 349(h). Sony's violation was willful and knowing.

## XI. PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully demands judgment against defendant Sony Music Entertainment as follows:

A. On the First through Fourth and Sixth Counts, compensatory damages in an amount to be determined at trial;

B. On the First, Second, and Fourth Counts, punitive damages in an amount to be determined at trial and in no event less than $1,247,500, the value plaintiff placed in writing to Sony on August 24, 2026 on the rights Sony sought to obtain by the conduct alleged, which Sony never disputed and abandoned the next morning;

C. On the Fifth Count, the declarations set forth in paragraph 65 above;

D. An accounting by Sony of all sums credited to Vendor Account No. 1226609 for every master credited to it, for all periods through June 30, 2026, including production of the royalty schedule referenced as Attachment 1 to the Party Agreement and the rate basis applied to each income line, and payment of any balance found due;

E. Pre-judgment and post-judgment interest;

F. On the Sixth Count, actual damages and such additional damages as N.Y. General Business Law 349(h) permits;

G. The costs of this action; and

H. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 25, 2026
Raleigh, North Carolina

Respectfully submitted,

/s/ Ishmael Sadiq Montague
Ishmael Sadiq Montague
Plaintiff, Pro Se
7321 Blaney Bluffs Lane
Raleigh, North Carolina 27606
919-264-1422
ismbeatsmgmt@gmail.com